Our next case on the call of the docket is Case No. 113-270, Terry Martin v. Keeley & Sons, Inc., Agenda No. 13. Counsel for the appellant? Thank you, Your Honor. May it please the Court? My name is Debbie Champion, and I am here today, along with Russell Scott, on behalf of Keeley & Sons, Inc. Mr. Scott and I request this Court to affirm the ruling of the trial court Judge O'Malley in that he correctly applied the rule of law of the State of Illinois that a party generally does not have a duty to preserve evidence. As Mr. Scott will further explain, the Fifth District Court of Appeals has completely changed the law on this issue by imposing on Keeley, a contractor for IDOT, the duty to protect property which didn't even belong to them in violation of IDOT's request that they get rid of the steel beam that had fallen from the bridge. In addition, Keeley's actions in this case do not constitute a voluntary undertaking to preserve evidence, and the proper application of this Court's rule of law as set forth in the Boyd case would have resulted and should have resulted in a judgment in Keeley's favor consistent with what Judge O'Malley did in this case. Keeley did not voluntarily undertake to preserve this beam. The Court will recall that this beam fell from a bridge over a creek that Keeley was in the process of building for IDOT. Three or four workers were standing on the beam. It rolled. It fell into the stream below. Now, under this Court's narrow and limited circumstances that the Court set forth in the Boyd case, this Court indicated that there might be very specific circumstances under which someone might be liable on a spoliation claim to preserve evidence, and the Court set those forth. They're things like you agreed to do so under contract, so you knew ahead of time you had to preserve evidence. You agreed to do so by specific agreement after an incident had occurred. So again, an affirmative act of agreement. You didn't agree, but a contract, I mean a statute, imposes an obligation on that party. Those sorts of things are what this Court pointed out would require an affirmative duty to preserve evidence. And finally, the fourth, and really in this particular case the relevant issue that we'll be discussing today, are the voluntary assumption without specific agreement but with affirmative act to preserve a piece of evidence. Those things must, one of those things must be present in order to satisfy the first prong to require a party to preserve evidence when under the law of the State of Illinois. Ms. Campion, with regards to that particular issue, Keeley never removed the I-beam from the creek, did they? That is right, Your Honor. Can it be said that Keeley preserved or segregated the evidence for its own purposes? It cannot. It cannot. And I'm not trying to be cute by saying really all they did was stood on the creek bed and scratched their head. They called OSHA. They called IDOT. They had their people come out. And at some point they called Egyptian Concrete, the manufacturer, because they knew they had to get another beam made. And they came out. And everybody stands there kind of scratching their chin looking at it until IDOT says, okay, OSHA's done their investigation. Get rid of it. And IDOT, who is in charge of this ultimately, even though Keeley was the contractor, IDOT said, look, if you leave that thing in the creek bed, it's going to ruin our bridge because it allows scoring or something like that to occur and it undermines the stability of the bridge. So you've got to get rid of this. Keeley never took it, Your Honor. They never took any effort, made any effort to preserve it or segregate it as the cases which have, the very few cases which have allowed a spoliation claim to go forward have required to do. They didn't take any effort at all to try to preserve this beam. Well, do you think that, excuse me, do you think that Keeley's awareness of the potential litigation is relevant to our duty analysis? I don't, Your Honor, and let me tell you why. Under Boyd, there are two prongs. One is the prong I just went through. All of the specific acts you must either first know or agree to in order to preserve evidence. And the second is foreseeability. The appellees in this case have argued, well, you knew you could be sued, so you have to preserve evidence. But, Your Honor, there is no law in Illinois, never has been any law in Illinois that says just because you know that you might be potentially involved in litigation, you have a duty to preserve. And there are good public policy reasons for that. But moreover, and more specifically to Boyd, what that argument does, if somebody says, well, you were a potential litigant, and therefore you should have preserved, is it gets rid of, wipes out the first requirement of Boyd. And it makes only one prong of requirement. Remember I told you first you have to agree to do it, and then there must be foreseeability that if you didn't do it, you could have a claim against you. What the argument of appellees does with that potential litigant issue, Your Honor, is it eliminates that first Boyd prong, and it says if it is foreseeable that you could be sued. If it is foreseeable that you could be sued as a potential litigant, you have to keep that evidence. That has never been the law in the state of Illinois, and it would completely nullify the Boyd prongs as well as this Court's Dardeen decision. There has never been case law to support that argument. Just a factual question. Sure. How long did the beam remain in the court? Until the next morning. I can't remember specifically the time that this occurred, but it was in the afternoon when the beam fell. The next morning what had happened is OSHA came out, IDOT came out, told them to get rid of it, and the manufacturer came out and they said, you know, if you cut the ends off of those, of that beam, the end caps off of that beam and get them to us, we can get you another beam out here quickly. So they went out, cut the end caps off, and cut the beam up into, they called it riprap, so it will go on down the stream. So the next morning they got rid of that. The duty is tied to the foreseeability element, right? I don't think so, Judge. They're two different elements. There's a foreseeability element. Can you also, if you've agreed to take this on and you did take it on, could you also have foreseen how important it was? As a result of that, you don't have any problem with the appellate court saying it was a foreseeability aspect was a question of fact for the jurors? You know, Your Honor, there is no fact to support foreseeability in this case, but I don't think we get there because duty is a legal issue. But to specifically answer your question, I think foreseeability is a fact issue. But that's a little bit different than how other courts have handled the aspect. Would you agree with that? Foreseeability can be something that the jury looks at, but other courts it seems have looked at them in tandem, right, that make it a question of law as to both duty and foreseeability. Is that right? They have, Your Honor. There have been some. And in this case, I think we can't get to foreseeability. But if the court looked at that first, I think you would also see that as a matter of law, there is no evidence before this court in the court record that would allow the court to make a factual issue out of foreseeability. So the court would have to rule as a matter of law. But the way Boyd set out the analysis, we first have to go to the, well, is there a duty to begin with? And I think we all agree that that is going to be a legal issue only. In addition, other than the status as a potential litigant, there's also an argument by the appellees that the ability or opportunity to control evidence places upon the holder or the controller of that evidence the duty to preserve. And, again, that is not the law in this State. The court has found, well, I'll just run through the districts. Every, almost every appellate court in this Supreme Court, in Miller v. Gupta, the Fifth District, in other cases have said there has to be something more than control. It's not just control. It's an affirmative duty to try to preserve it. Segregate, preserve, or otherwise try to set it aside so that someone knows or someone is trying to protect this evidence. The Second District in the Anderson case we cited, the First District, district after district, court of appeals after court of appeals hold that the opportunity to control evidence is not enough. Here we didn't own the evidence. We controlled it to the extent of we did with it what the owner told us to do with that. Now, with respect to the other issues in the case, I noticed that my amber light is on, so I will simply turn it over to Mr. Scott to say that adoption of this notion or this argument or this position of the Fifth District expands Boyd, and it expands and really nullifies Illinois law, and Mr. Scott will further discuss that. Thank you. Good morning. May it please the court, my name is Russell Scott. I also represent Keeley and Sons. The appellate court, I represent Keeley in a personal capacity just to explain why there's two of us here. Some years back, the Fifth District held that there was no insurance coverage applicable to this case, and that's why I'm representing Keeley against the plaintiffs. Coverage does exist for the claims of contribution which have been brought by Henderson and Egyptian, and that's how Ms. Champion fits in. Eight years ago, I stood in front of this court to argue that the appellate court had improperly applied the And this court issued a strong and decisive opinion at that time, reaffirming all of the principles of Boyd as the controlling authority in Illinois in the area of spoliation. That case was Dardeen v. Keeley. Now, once again, I ask you to reverse an action of the appellate court for the Fifth District. Following up on Justice Freeman's question, the accident occurred on May 29, 2001 at 3 o'clock in the afternoon when a large concrete beam embedded with steel parts rolled on a bridge project, injuring three of Keeley's employees. The beam landed in a creek below the bridge and broke in half, and there the beam stayed essentially untouched for 17 hours, a little over 17 hours, until the morning of May 30th when it was hammered into riprap. OSHA had completed its on-site investigation and had concluded that the beam had rolled because of excess weight from the people who were standing on this beam, which was not tied down. It was really kind of a classic, silly accident. IDOT also completed its on-site investigation, but indicated it did not want the beam to remain in the creek because of the scouring effect that the beam blocking the water of the creek would have. So in that entire 17 hours, it had not been moved, it had not been segregated, it had not been, you know, no police tape or fence or anything like that had been put around it. It just laid there in the creek. Mr. Keeley was asked in a deposition if he could have taken it out of the creek and taken it somewhere else. And he said, well, yeah, we could have. We didn't have the equipment on site to do that, so it would have required bringing a piece of equipment in, taking the beam out of the creek, putting it on a truck, and taking it somewhere. And no one asked him to do that. Neither the state, nor OSHA, nor any of the parties in this litigation made any request of him to inspect the beam or take any action with respect to the beam. And in the meantime, of course, the state wanted this project to move along and wanted this beam to be taken care of. In addition, of course, we found out from Egyptian that if we had the metal parts from that beam and could deliver them back to Egyptian, then that would hasten the preparation of a new beam, which would then help the project move forward. And that's what was done. And those were taken out, and then the rest of it was literally just chopped into little pieces and left as riprap in the creek. The court, interestingly, the appellate court in this case, found a voluntary undertaking, which was not what was being argued by the parties against Healy at the time. They were arguing that there was a special relationship that had occurred because of the employer-employee relationship, and they also argued the foreseeability question that Justice Thomas mentioned. The appellate court decided on its own that there was a voluntary undertaking. However, there was never any evidence, when one looks at all those other cases that have been decided that deal with voluntary undertaking, they all include some form of affirmative action by the party against whom spoliation is claimed, either an express agreement in some cases. Boyd is a classic example that the insurance company said, we'll keep this heater until everybody gets a chance to look at it, and then they threw it away. Other cases where they held that either through express agreement or through their action, they had made a conscious effort to actually not only keep control of it, but keep control for other people. And there was none of that here. It just simply, I mean, the shortness of time is partially a factor, and the fact that no one asked them to keep it, and they didn't see any need to. Is there any concern here, counsel, that in talking about that, that if we agree with your position that we would be encouraging parties or entities to hurry up and get rid of it before anybody has a chance to ask it, or, you know, in other words, quicker you do it, less chance there is there's any kind of a claim? Well, I mean, certainly I could see in a different circumstance that happening. But we start, remember, that the basic principle of law here is that there is no duty to preserve evidence. Everything else, all spoliation cases, have to find an exception to that rule. And voluntary undertaking is one of those exceptions. In this case particularly, I mean, if OSHA had said, you know, maybe this ought to be kept, I'm sure it would have been. If IDOT had said maybe this ought to be kept, I'm sure it would have been. I mean, one of the things that is interesting in this case is that the two parties that did conduct investigations were parties that Keeley owed an obligation to, either legally or by contract. And so they had the best opportunity to preserve this evidence or order it to be preserved. And they simply did not do that. So what is happening here is an attempt to expand, again, the idea that there ought to be some general duty, if you look at what Justice Spomer said in his dissent, which we thought was very compelling. He says, in this case, Keeley and Sons did nothing more than allow government agencies to inspect its property in accordance with law. To extend the voluntary undertaking exception to the owner of the property in question under these circumstances is tantamount to finding that there is a general duty to preserve evidence in Illinois. Boyd said there's no such duty. Dardeen reaffirmed that principle. Even all the cases where they find spoliation, the courts all start off by saying there is no general duty to preserve evidence. So what the court is doing here, what the Fifth District is attempting to do here, is essentially to extend the exception to the point that it wipes out the rule. And that's what we're asking this court to reverse. Thank you. Thank you. Counsel for the appellee. Good morning. May it please the Court. My name is Anthony Gilbert. I'm from the Law Firm of Crowder and Skaggins in Columbia, and I represent the plaintiffs Terry Martin, Ardith Nguyen, and Ricky Vanover. Quite frankly, I think the issues have been outlined well by the Fifth District and by the appellant in this case, and that is whether the first prong of the Boyd duty analysis and spoliation of evidence cases has been satisfied in this case. Obviously, we believe it has. We believe that we agree with the Fifth District in that Keeley and Sons voluntarily assumed a duty to preserve this failed beam. Now, before we get into the issues of... Are you arguing that Keeley's compliance with OSHA standards created the duty of care? Not in and of themselves, Your Honor. I don't believe that it probably would not be good policy to say that mere compliance with governmental regulation or governmental inspection in and of itself gives rise or inspires or propagates a voluntary undertaking to preserve the evidence. But that's not all that happened here. And appellant would like this Court to believe that. They would have liked the Fifth District to believe that. But in this case, after the beam failed, the appellant's own engineer inspected it. The appellant's own engineer drew conclusions as to why the beam failed. And then after those conclusions were drawn, the appellant destroyed the beam. But they did actually preserve some of the beam. They kept the parts it needed. It needed the steel embeds on either end of the beam that bear the weight of the beam so that it could get a new beam more quickly. And as a practical matter, we all know in the construction business, time is money, and I understand that. But they kept those parts. They also kept the interior steel pre-stressed tendon components, essentially rebar, and they recycled them. So those were, they either got a credit against, you know, either they made more money on the project or I got a credit back for whatever was recycled, if it's true that this beam was not the property of Keely and the beam was the property of Ike. When did the duty of preservation occur? At what point did they first preserve something? As soon as they kept that beam for their own benefit. And in my opinion, their benefit was the inspection by their own engineer, the preservation of those portions of the beam that they could reuse. And to a lesser degree, but part of the analysis is hanging onto it long enough for these other agencies to inspect it. And I don't even know that those requests were made. The facts of that are, frankly, a little bit underdeveloped. But once that happened, once Keely took the opportunity to draw its own conclusion as to why this happened. Is that in the record, Counsel? What's that, Your Honor? I know in reply to you, to the argument that you're making here, Keely indicates that there's no record citation that they made their own observations through their engineer. Yeah, I disagree, Your Honor. Page 393, excuse me, well, it's C03956 to 3960 contain the three pages of calculations that Keely's engineer. Could you give me those again? Certainly, Your Honor. It's on, for whatever it's worth, it's on page five of our brief. It's page 03956 to 03960. That's a letter from Keely and Sons together with the three pages of engineering calculations performed by Mr. Layman that were submitted to IDOT. So to say that there's no citation to the record that Keely performed an inspection of the job site and an analysis of the cause of the failure of the beam, that's just not accurate. We did cite to the record. Now, they may disagree that that's an adequate cite to the record, but it's in the record. And in Mr. Keely's deposition, this is page 4330 of the record, page 48 of the deposition lines one through six, he indicated that they concluded there was no problem with the beam, but if they thought there would have been a problem with the beam, they would have made note of that problem. They would have pursued that problem. Now, this kind of gets into the foreseeability analysis, which arguably, understandably, is the second hurdle that we have to get over in this case. But throughout its brief, Keely sort of conflates, well, we didn't have any, the two prongs saying, well, we didn't have any idea it was relevant, so we were just getting on with business. Well, you didn't know it was relevant, but you said that if you would have thought there was something wrong, you might have done something about it. I think that to say that there's no evidence in the record at all that Keely had any idea that this could even possibly be relevant to potential future litigation just sort of ignores the facts. Is there a, if we agree with you, are we creating or saying there is a freestanding duty to preserve evidence in every case? I don't think so at all, Your Honor. I don't think so at all. Now, where do you draw the line? Is it the fact that they went out and looked where the accident was? In other words, they went out and looked? I think there's more than that, and looking at it, obviously, I don't think that would be enough. I mean, it's hard to hypothesize, but I don't think that would be enough. But when you're determining the cause of the failure, you're preserving portions of that beam for your own benefit, and then it's gone, and whoever might be impacted by this is forever without an opportunity to perform their own investigation and draw their own conclusions. You've undertaken. Now, whether they breached their duty, whole separate analysis, and maybe they didn't. I think they did, but maybe they didn't. Maybe the court will later determine, yeah, you had a duty, but you didn't breach it because you did what you needed to do. How did they preserve it? Well, they – I want to be very careful about this because to say it was – I mean, it kind of conflates all of the negligence principles together. You know what I mean? It's sort of getting a duty and a breach together, but they preserved it by keeping it in its failed state long enough for their guy to draw – to analyze it, figure out what he thought the cause of the failure was, and then use that information to create a mathematical formula as to why it failed the way they believe it failed. And they kept the steel portions of the beam that they needed. They actually physically retained them and shipped them back to the manufacturer of the beam. So they kept what they wanted and needed. Wasn't that at the request of the manufacturer, though? The manufacturer said, if you do this, we can get you a beam more quickly. So – But it wasn't mandatory. But they didn't – they didn't preserve it in the sense of we're going to keep it and study it in our shop or in our warehouse or in somebody else's warehouse. No, but I don't think the law requires a preservation for the purpose of setting it aside as evidence. The law doesn't require that. If the law were – if the law were, well, if you recognize that it's evidence and if you keep it for the purpose of preserving it as evidence and then you lose it, that's foliation of evidence. Well, that's fine, but then we might as well throw a void out because we don't need that two-part analysis anymore because that kind of just gets rid of the relationship and that provision of void. And all the voluntary undertaking does for us in this case is satisfy the relationship. Now, if it was not foreseeably relevant or material, then there's still no duty. And we've got a lot of work to do still in that regard. But to say in this case that the relationship prong of void was not satisfied because there was no voluntary undertaking I think ignores the facts of the case. And I think that to get ahead of ourselves and start talking about whether or not it was preserved for the purposes of being evidence has never been required under Illinois law before. But the fact that the steel portion of the beam was used, we could conclude that there were no flaws in the steel portion? I think that's a fair conclusion. I think so, Your Honor. And the steel portion still remains? They are – as far as I understand it, they're sitting on the bridge today, Your Honor. Was there any testing or analysis performed on the I-beam? No, because it was destroyed less than 24 hours after it failed while one of my clients was still in the hospital. So the fact that – I mean, I see the OSHA, and you're saying that's not enough. Preserving it for OSHA and IDOT isn't enough. You're coupling that with the engineer making the determination of what occurred here, right? Yes, I think – Let me just stop you. I'm sorry, Your Honor. But that is – the engineer's determination isn't based on any testing or analysis performed on the beam. He – I disagree. I would say that – I'm sorry if I'm getting – No, go ahead. I speak loudly anyway. I apologize. I would say that when they arrived, they formed some assumptions about how this happened. And when I say they, I mean the president of Keeley Construction and his engineer. They probably formed some assumptions about what happened. And based on what they saw and what they observed and all the photographs that they took and kept, their engineer went back and drew up calculations that supported or were based – either supported his pre-drawn conclusion or were based upon his observations of the job site and the failed beam and the condition it was in. Nobody else even had a chance to look at that beam and the condition it was in laying in the creek bed. And if that beam would have been preserved, then tests on the concrete and tests on the steel and a visual inspection of the beam and sonography or whatever else might be appropriate could have been done on the beam. Well, if they had done nothing, right, with the general rule that you agree with, if they had done nothing, they wouldn't be subject to the claim, right? And you're saying that OSHA and IDOT isn't enough to subject them to a voluntary undertaking. So I'm trying to find out what coupled with that is enough. And you're saying it's that they made a determination. Well, aren't entities always going to make a determination as to what happened? I'm trying to understand why this isn't doing nothing. Well, and I guess we're focusing on the voluntary undertaking because that was the decision of the 5th District. But that's not the only thing in this case that I see as potentially forming the basis of the duty. I also believe that Keeley's possession and control of this, as evidenced by everything that they did with it, is probably a sufficient special relationship by and between the parties. The employer-employee relationship, I think, also forms another potential basis. Now, admittedly, that's a novel proposition. I'm not going to stand here and tell the Court that there is existing law. But, you know, we have respondeat superior. We have special rules by and between employers and employees. And, in fact, it's in draft form with a restatement third of torts. You know, prior to the institution of workers' compensation laws really changed the employer-employee relationship. But prior there, too, and really still to this day, an employer has a duty to provide a safe work environment for its employees. And when an employee was injured and was in a location where the employer was the only one who could render aid, the employer had a duty to do so. They had a duty to take care of that person, the employee's person and property. It's similar here. We have a circumstance where we have an employer who has absolute control of the instrumentalities of its employee's work site. And within hours after they're severely injured on the job, the crucial piece of evidence in what would be clear to most reasonable persons of a potential claim is gone. Should they have left it in the creek bed? That's not true. Well, IDOT said that they had concerns. I don't know that they were as grave as appellant would have the Court believe. However, if IDOT tells them to get it out of the creek, I think they can get it out of the creek. But IDOT never said anything about destroy that thing. And they could have easily removed it. If they can get the pieces out they need, they could have easily moved it off to the side. So should they have left it in the – I mean, it is in the creek as a practical matter. It's in smaller pieces, but it is in the creek. Should they have left it in the creek? Probably not if IDOT was telling them that. If there's no dispute that there was no request for preservation. There's no time, but no. Then how would cases like Miller and Darden, that emphasize the importance of that, affect this case? Well, I think the request is a factor to be considered about whether or not special circumstances exist. The Anderson case specifically declined to extend a duty based on a request alone. And essentially my argument is the inverse of that. The lack of a request – if a request alone is not sufficient to impose a duty, then the lack of a request in and of itself should not be sufficient to avoid the duty. And kind of getting back to what the – one of the concerns the Court's already raised, it's essentially a race to the bottom. If we get rid of it fast enough, and if nobody asks us to get rid of it, and if we maybe just don't do anything just because we don't, then if we get rid of it quick enough, then we're not going to be saddled with the duty. Mr. Gilbreth, you alluded to the Workers' Compensation Act and the relationship between employer-employee, and you did so also in your briefs, I believe. Are you – I want to understand the argument or your reference to it. Are you arguing that there was a duty by the employer to maintain the beam in connection with a workers' comp claim? That wouldn't have anything to do with it, would it? No, because that's a no-fault system, Your Honor. No, I wouldn't look at it that way. What I would look at it as is when – my position is that the employer-employee relationship could be recognized and perhaps should be recognized by this Court as a special relationship under Boyd that would then put the employer in a position of, okay, if your employer has a duty or, excuse me, is in a special relationship with his employees, therefore, if the employer is in possession of a piece of evidence that is foreseeably material to potential litigation, then the employer then has a duty to preserve that evidence. To preserve it for the employee's potential litigation against the Egyptian or someone else. Against a third party, correct, Your Honor, or even the employer's own – or, excuse me, even the contribution claim potentially against the employer from the third-party defendant. Just a quick question. Do you – if we get to foreseeability, do you believe this Court should handle it as a matter of law? In all candor, I've talked – we've talked about that a lot around the office because duty generally is an issue of law, but foreseeability generally is a question for the jury. I would – I would say probably not. I think that if you're entering into a foreseeability analysis of whether or not a reasonable person – and I apologize, I think my time has expired. We talked about this downstairs. I'm colorblind. So the red and the amber, I'm confused. Your time has expired.  Would you like me to finish my thought? Please, Your Honor. Okay. And I've lost my train of thought. Foreseeability. Thank you, Your Honor. Thank you. If we're asking the question of whether a reasonable person in the same or similar circumstances as the alleged spoliator did or should have foreseen the materiality of this evidence, that sounds an awful lot like a jury question to me. So I don't know that it should be decided as a matter of law. It seems to me like a question that ought to be decided by a jury. But obviously this Court has much more weight on that issue than I do. Thank you very much. Good morning. May it please the Court, Counsel. My name is Georgeann Oliver, and I represent Egyptian Concrete in this matter. I have taken just a few moments of the time, as I think Counsel for Plaintiff has set forth primarily our arguments, as well as their own with regard to the first prong of the test in this case. I would like to point out a couple of things, however. I think there was a reference early on that Egyptian Concrete did come to the site. There's no indication in the record that Egyptian actually came to the site at any time, and certainly not before the beam was destroyed. There's also been a question raised with regard to whether or not there was any type of a request to view or inspect the beam. The plant manager for Egyptian was deposed, and at one point he was asked whether or not anyone, whether he or anyone from Egyptian ever asked Healy for the opportunity to inspect the beam, and he did reply yes to that question. There is no indication that he was afforded that opportunity. With regard to... Is it clear that Egyptian told them that if they got the end caps, they could make another beam faster? Yes. Yes, the call was made within the day of or the day after, and the plant manager did indicate that if they could get those plates out, we could make that more quickly because we didn't have to go to another manufacturer for those. With regard to the voluntary undertaking, as was noted, Council has gone through those, and we also cite in the record the calculations that were made by the engineer. Mr. Healy and his engineer, both of whom have had extensive work in the construction business, did come out, spent their time, made their calculations, made their determination as to what they thought was the cause of the incident. Ms. Oliver? Yes. Getting back to Justice Garland's question, you said that the Egyptian plant manager said to Healy, if you can get those out, then we can, you know, make a new beam. Is that right? Correct. And they did so the day of or the day after the accident? Yes. They removed the plates at the time that they destroyed the beam. But now you're asking that they should have, or you're saying they should have preserved the evidence. There was methods by which those plates could have been removed and leaving the rest of the beam intact, or at least enough of it to perform testing on. There wasn't a need to jackhammer it into riprap. Well, did Egyptian offer to help do that or to help secure and preserve it, the way you say? I don't think there's anything in the record that supports that, Your Honor, no. What was the rest of the beam, once the steel portion is removed? What is left, just the cement? Yes. There is some rebar with some cement with the plates at the end which hold the beam into place. And the cement, is it poured at the site? No. It's formed and then brought to the site. And by that, and that's another point where, just a little bit of background there, is that when they poured it, they could see if there was a defect at that time. But once it's poured and the insides are obviously covered, there's no way to tell if there's a void or anything on the inside unless the appropriate testing is undertaken, which might be an x-ray or something else. And the design did not change? No, no it did not. So it's not a design problem? It's not a steel portion problem? I have to see that. The allegations against my client are that it is defective. And in order to defend that it's defective, we would need that portion of the concrete to do the testing on that to see if in fact it was. The reason we're here today. I would like to conclude. I see my light is on as well as I didn't. I think that what the appellate court did was appropriate in analyzing the facts and applying them to this court's two-prong test. Particularly with regard to the first part. Your time has expired. Thank you, Your Honor. We would ask that the court affirm the appellate court in this matter. Thank you. Thank you. The appellee in this case says the preservation of a portion of this item for reuse and not for evidence means there was a voluntary undertaking. That flies in the face of every case this state or any appellate court in this state has ever set forth. In Miller v. Gupta, the court said in that case there was an assumed duty to preserve for evidence. They requested it. There was a request to have that done. And it was segregated. The Bobry case, the only case where there's been a finding of something that should be submitted for spoliation, the court said Enterprise Rent-A-Car segregated and committed to preserve this for evidence. The Jones v. O'Brien case, O'Brien Tire, the defendant undertook to segregate and preserve it. They had actual control and assumed the duty to preserve as evidence. Frye v. Medicare Glacier, the Boyd case. They undertook and segregated the heater and then they lost it. In this case it fell, we left it there. There was no action to preserve it. There was no request for us to preserve it. There was no segregation. There was no covering it or trying to protect it. That had to happen under the current law in this state. Earlier, Judge Gurman asked, do we encourage parties to destroy evidence? And I submit to this court, we do not encourage parties to destroy evidence. What we encourage is this, the reason for the rule to begin with, there is no general duty in this state to preserve evidence. Why not? Because we want safe sidewalks. We want people to fix the problems that are there. Not to continue to let them be there because they might get sued if they fix it for spoliation. We want people to fix machines that are dangerous. We want people to take out beams from creeks that might undermine bridges. And for that reason, we don't encourage people to destroy them, Your Honor, because there are other remedies. If people come in and they are in a case and they say, I don't know what happened to that. It was destroyed. There is an adverse inference that can be drawn with respect to those types of actions, and that's the remedy that the plaintiffs would have in a case where a proper defendant destroyed evidence that it shouldn't have destroyed. Thank you. I'll let Mr. Scott take the rest of the time. Thank you. I just want to address a couple of questions that have come up. First of all, about this part of the record regarding Mr. Lehman, who was the Keeley engineer, and I certainly invite the court to review that letter very carefully. It's at C03956 and 7, and then some calculations follow. It's very evident in that letter, what the purpose of this letter is, is not to discuss the cause of the accident. What the purpose of the letter is, and it's addressed to IDOT, is to ask for additional time to do the project. They point out that it will take from, they won't get a new beam until June the 11th, and they say they will be back to the pre-accident point by June 18th. And they do do some calculations for Mr. Lehman. The letter is actually from Mr. Keeley. But it certainly is not an attempt to determine how the accident happened. Also, to Judge, to Justice Carmeier's point about the workers' comp situation, Mr. Keeley's deposition is contained in the record, I think he was deposed more than once, about the foreseeability issue, and he says, we thought there, you know, we had three of our employees in the hospital. We thought there would be a workers' compensation claim. There was no other party. There was no other contractor. There was no other company on this job or at this scene. The only people involved in this were Keeley and Sons. So he had certainly no idea that there would ever be a lawsuit. That actually was, frankly, some creative pleading by a very talented lawyer in St. Clair County. But the foreseeability that is mentioned, the appellate court's ruling on that point, and I note that the amicus in this case has suggested that the appellate court was in error, that it's a question of law on the issue of the foreseeability. And to be honest, I tend to agree generally that it is a question of law. We certainly would not be unhappy in this particular case if we had to submit that issue to a jury. We believe the evidence is pretty strong. Lastly, let me talk about this so-called request from Egyptian. There is one answer to a question in a deposition by this Mr. Schmidt, who was the Egyptian plant manager. And when I was preparing for this argument, it really, when I looked at this, it was so out of context that he did answer yes when he was asked, did you or anyone from Egyptian ever ask Keeley for the opportunity to inspect it? And then there was no other questioning about that request, and it just seemed so odd to me. So I went back and I reread the entire deposition, and there's a lot more testimony, and it's all in the record before you, from this same gentleman, COC01741. The evidence in this case that the I-beam that fell did not crack or break until it hit the ground below, would it have helped you to go to the scene of the accident to see that beam, to try to figure out what happened to the beam? And Mr. Schmidt says, you know, this wasn't that big a deal to us. I mean, things like that I'm not going to say happen all the time, but they have problems that occur, and you know, they may break something or something doesn't fit. I wasn't real interested in it. Like I said, you didn't ask Keeley and Sons to save the beam for you to inspect it to see whether? Answer, no. So as far as you were concerned, from what you knew about that beam, the concrete and the ability of the concrete to hold weight was not the problem. I was never worried about that because of the test that happened before it got sent out. You know, I mean, that was the furthest thing from my mind that we had any responsibility for bad concrete. So, I mean, there really is, there was nothing wrong with the concrete. There was nothing wrong with the steel. This accident happened because too much weight was put on this beam and it rolled over, and that's what IDOT found and that's what OSHA found, and that's what this case, you know, was always about. So this idea somehow that there's this need for Keeley to have spent a lot more money to remove the beam, bring in equipment, remove the beam, take it somewhere, is really, it seems to me, important. How would you define what occurred by the inspection and the taking of the pictures for Keeley's own purposes? Well, does it have any import to this? In part, of course, they're going to have to support this request for more time from IDOT. Secondly, of course, this is an accident that happened. They've got to know why it happened to some extent so it doesn't happen again. This was obviously an unusual occurrence. Thirdly, of course, there was the, I agree it's a no-fault situation, but there was the issue of the workers' comp claim that was clearly going to be outstanding. But I don't think that they were preparing for some litigation. No one thought anything happened here except that the beam rolled. Thank you, Your Honor. Appreciate it. Thank you. Case number 113270, Martin v. Keeley, is taken under advisement as agenda number 13.